**[Cite as *S.W. v. D.R.*, 2026-Ohio-1632.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

S.W.                                                   Court of Appeals No.  {48}L-25-00158

      Appellant                                    Trial Court No.  DV 02021-0392

v.

D.R.                                                   **<u>DECISION AND JUDGMENT</u>**

      Appellee                                     Decided: May 5, 2026

* * * * *

Megan E. Ward and James S. Adray, for appellant.

Karin Coble, for appellee.

* * * * *

**DUHART, J.**

**{¶ 1}** Appellant, S.W., appeals the judgment of the Lucas County Common Pleas Court, Domestic Relations Division, journalized June 16, 2025, which denied a motion to renew a domestic violence civil protection order (hereinafter "DVCPO") against appellee, D.R., and additionally denied a motion to show cause.  For the reasons that follow, we affirm.

**Background**

{¶ 2} S.W. and appellee, D.R., were divorced from one another on September 30, 2022. They have two minor children.

{¶ 3} On December 16, 2022, a DVCPO was issued against D.R. until March 25, 2025.

{¶ 4} On August 22, 2024, S.W. filed a motion to show cause alleging that D.R. was in violation of the DVCPO as a result of D.R. stating to S.W., "I'm going to f***ing kill you" at the end of a hearing on June 27, 2024. S.W. also filed a motion to renew the protection order on February 28, 2025. The DVCPO was extended first until May 30, 2025, then an additional two weeks.

{¶ 5} A hearing was held on April 16, 2025. S.W. and Jeffrey Nunnari, D.R.'s attorney during the June 27, 2024 hearing, testified. Relevant to the instant appeal, S.W. testified that at the conclusion of a hearing on June 27, 2024, she was sitting in the magistrate's courtroom with her attorney, James Adray, D.R. and Nunnari, when D.R. was "discussing some of the paperwork that needed done and was insisting that he sent Adray information . . . and then he . . . started to get more aggressive in his tone . . . about that information." D.R. walked toward the back of the courtroom, turned around and said, "I would, I will fucking kill you" and then walked out into the hallway. Upon the advice of her attorney, S.W. filed a police report that day. S.W. stated that she "was shaking and crying, and it, the, the face that he made and the tone in his voice was just like it was a few years ago when he choked [her], so it brought back all that information." According to S.W., that incident caused her distress and to lose sleep and as a result she

2.

heightened security at her home by adding another camera to the outside. She believes D.R. "can execute on that threat."

{¶ 6} She also commented that "he makes messages in the app about how he knows everything that's going on with me" which makes her feel "that he somehow knows about what's going on in my house and where my whereabouts are and what I'm doing when he makes those kinds of statements" and that D.R. "made allegations of medical neglect and abuse" by S.W. and threatened to "go after [her] medical license" probably two years before the hearing. Additionally, she asserted that in December of 2023 her children were evicted from their preschool "based on parental discord." She wasn't sure why. She also detailed issues relating to the custody of their children, including a time when he told her he had custody when he didn't and a time D.R. altered the original judgment of divorce to "make him have fifty-fifty custody" and presented that to the school.

{¶ 7} Further, S.W. discussed the incidents that resulted in the initial DVCPO. These included a time when she went to "the home" to get some of her items and let D.R. see the children and he refused to let her leave and took stuff out of her car, necessitating the intervention of a neighbor who was a Toledo police officer. Then a few days later she went to the house and he refused to leave, again resulting in the same neighbor coming over and removing him from the house. She testified that during these incidents, there was no hitting, "more just pushing [her] out of the way," but that there was another incident, in 2019, when he put his hands around her neck and choked her. There were

3.

also occasions when he would reach into her car to unlock the door and get the children out, and a dispute at an emergency room where the police were called.

{¶ 8} Nunnari testified that although he did not remember the date of the hearing, it was on a date they had been in court and D.R. was subsequently criminally charged as a result of events that allegedly occurred in the courtroom. According to Nunnari, at the conclusion of the hearing, D.R. exited the courtroom followed by Adray, and he "heard something in the nature of a conversation. [He] couldn't make out the words. [He] knew there was a verbal exchange between [Adray and D.R.]. . ." Nunnari then saw S.W. "take one of her hands and place it over her mouth." Nunnari did not hear D.R. threaten S.W. or talk to her at all that day.

{¶ 9} The court took the matter under advisement, then issued its judgment entry on June 16, 2025, denying the motion to renew the DVCPO and dismissing the motion to show cause. The court noted that, since the issuance of the DVCPO, there have been "in excess of twenty-three (23) motions filed by the parties, twenty (20) orders and/or decisions, and nineteen (19) Court appearances in post[-]divorce proceedings" in the domestic relations case. The court then detailed the testimony presented, considered the pertinent statutory requirements in R.C. 3113.31 and R.C. 2903.211, and then made the following relevant conclusions:

7. At the time of the original [DVCPO] hearing in 2022, this Court found [D.R.] assaulted [S.W.] in 2019, shoved [S.W.] in 2020, and engaged in a pattern of conduct which fell within the purview of the domestic violence statute and issued the order of protection pursuant to R.C. 3113.31.
8. Since the divorce has been finalized and the issuance of the protection order, there have been no reports of physical aggression.

4.

[S.W.] alleges a single isolated threatening statement was made in the courthouse with attorneys present. The statement was not heard by the witness. Moreover, the Court is not persuaded that if such a threat was made, that it was specifically directed at the [S.W.], as the circumstances surrounding the incident do not identify the intended target of the alleged threat.

9. The parties continue to experience high co-parenting conflicts which shall be addressed in DR2020-0246, by separate order.

10. The Court heard the testimony presented by [S.W.] and [D.R.]'s witness, witnessed their demeanor in Court, the manner in which they answered questions presented to them and the plausibility of their claims and finds [S.W.] failed to prove domestic violence or a threat of domestic violence by a preponderance of the evidence. The Court therefore declines to renew the [DVCPO]. Additionally, the Court failed to find [D.R.] in contempt of court for violation of the [DVCPO].

## Assignments of Error

{¶ 10} S.W. appealed, raising the following assignments of error:

I. THE DECISION OF TRIAL COURT, REFUSING TO ISSUE THE EXTENSION OF THE DOMESTIC VIOLENCE CIVIL PROTECTION ORDER, IS DIRECTLY AGAINST THE MANIFEST WEIGHT OF EVIDENCE.

II. THE COURT'S BLATANT RELIANCE ON . . . FACTS IN THE DIVORCE LITIGATION IS IMPROPER EVIDENCE TO CONSIDER OR SUPPORT A DENIAL OF THE EXTENSION OF THE DOMESTIC VIOLENCE CIVIL PROTECTION ORDER.

{¶ 11} For ease of analysis, we consider these assignments of error in reverse order.

## Second Assignment of Error

{¶ 12} S.W. has objected to the trial court's reliance on facts from the parties' divorce litigation. We need not decide if this was error, because if it was, it was invited error. "Invited error is an error that a party invited or induced the court to make." *State*

5.

*v. Rosas*, 2025-Ohio-5022, ¶ 31 (6th Dist.), citing *Davis v. Wolfe*, 2001-Ohio-1281. At the hearing, S.W.'s attorney specifically asked the court "to take judicial notice of both the Domestic Relations case and the proceedings in the DV case," and further asked D.R.'s attorney to stipulate to that, which D.R.'s attorney agreed to do. Later, S.W.'s attorney specifically asked "since we're stipulating to the [domestic relations] case, the [domestic relations] Judgment entry can be considered by the Court in this proceeding, correct?," and additionally clarified "[a]nd its contents," to which the judge ultimately responded in the affirmative, and S.W.'s attorney then questioned S.W. on the contents of a judgment entry from the domestic relations case. Based upon this, we find S.W. invited any potential error and she cannot object to the trial court's taking judicial notice of the facts of the parties' domestic relations case.

{¶ 13} Moreover, S.W. contends that the trial court's statement regarding "high co-parenting" is based on information from the divorce and thus not proper consideration regarding the DVCPO, however, there was testimony presented at the DVCPO hearing by S.W. concerning conflicts in parenting between S.W. and D.R. and events relating to the domestic relations case.

{¶ 14} For these reasons, we find S.W.'s second assignment of error not well-taken.

### First Assignment of Error

### Standard of Review

{¶ 15} We review the issuance or denial of a DVCPO under a manifest weight standard of review. *K.H. v. P.M.*, 2025-Ohio-263, ¶ 78 (6th Dist.). "Under a manifest-

6.

weight standard of review, an appellate court 'will not reverse the trial court's decision if it is supported by some competent, credible evidence going to all the essential elements of the case.' 'Further, on appeal, we presume the validity of the trial court's factual findings because the trial court is in the best position to observe the witnesses and weigh the credibility of the proffered testimony.'" (Internal citations omitted.) *J.F. v. Twining*, 2025-Ohio-5823, ¶ 32 (6th Dist.), quoting *Smith v. Strong*, 2017-Ohio-6918, ¶ 16 (6th Dist.). A "'[m]ere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment.'" *K.H.* at ¶ 81, quoting *Sotnyk v. Guillenno*, 2014-Ohio-3514, ¶ 4 (6th Dist.).

### Analysis

{¶ 16} S.W. requested a renewal of the DVCPO. R.C. 3113.31(E)(3)(c) allows for the renewal of a DVCPO "in the same manner as the original order or agreement was issued or approved." "Renewal of such a protection order requires 'a new finding of domestic violence, or threat thereof … to justify issuance of what amount[s] to an effectively new [protection order].'" *Spaulding v. Spaulding*, 2021-Ohio-533, ¶ 9 (6th Dist.), quoting *Lundin v. Niepsuj*, 2017-Ohio-7153, ¶ 18 (9th Dist.).

{¶ 17} "To be entitled to a protection order under R.C. 3113.31, a petitioner must show by a preponderance of the evidence that the respondent has committed domestic violence, as defined in R.C. 3113.31(A)(1), against a person with whom he has or had a family, household, or dating relationship, as defined in R.C. 3113.31(A)(3), (8), or (9)." *K.H.* at ¶ 74, citing *Felton v. Felton*, 79 Ohio St.3d 34, (1997), paragraph two of the syllabus. This includes a former spouse. R.C. 3113.31(A)(3)(a)(i).

7.

{¶ 18} Relevant here, domestic violence is defined as including "[p]lacing another person by the threat of force in fear of imminent serious physical harm" or engaging in a pattern of conduct which "knowingly cause[s] another person to believe that the offender will cause physical harm to the other person . . . or cause[s] mental distress to the other person . . . ." R.C. 3113.31(A)(1)(a)(ii) and R.C. 2903.211(A)(1). "Pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). Therefore, to be entitled to a renewal of the DVCPO, S.W. was required to show, by a preponderance of the evidence, that D.R. committed domestic violence after the acts relied upon in the initial DVCPO.

{¶ 19} S.W. contends that the trial court erred in denying her request for an extension of the DVCPO and in requiring her to establish a pattern of conduct because she was merely requesting "an extension of a DVCPO not a CPO premised upon the crime of menacing by stalking, which requires the movant to establish a pattern of behavior." She suggests that the trial court used the incorrect legal standard when deciding whether she was entitled to a renewal of the DVCPO because, while establishing menacing by stalking is sufficient to establish domestic violence, it is not a necessary condition. She points to a statement by the trial court that she alleged "a single, isolated threatening statement" as evidence that the trial court was requiring her to establish a pattern of conduct. She also cites the trial court's finding that there have been "no reports of physical aggression" after the finalization of the divorce and the issuance of the DVCPO.

8.

{¶ 20} We find that the trial court's statements, relevant to whether S.W. established a pattern of conduct, are reasonable and do not create a question as to whether the trial court used the wrong standard. The trial court properly listed the possible options that can result in a finding of domestic violence, and engaging in a pattern of conduct is one potential option to establish domestic violence.

{¶ 21} As to whether S.W. established by a preponderance of the evidence that D.R. committed domestic violence, S.W. relies upon her testimony that D.R. stated at the hearing that he "would fucking kill" her and she asserts that D.R.'s previous "aggressions" serve "as a reasonable basis to be concerned with or fear potential future volatile encounters with" D.R. and "establish a pattern of conduct." She also insists that "the statement threatening to take her life, in conjunction with a myriad of other concerning behaviors, caused her legitimate fear for imminent safety." She maintains that there was no denial that the in-court threat was made, and thus "it must be accepted as being factual." Additionally, S.W. contends that the trial court failed to consider "an abundance of uncontroverted evidence" including: that she is in mental health counseling because of D.R.'s actions; D.R. uses litigation to attack her; D.R. threatened her medical license and challenged her medical judgment; D.R. could act on the threat; as a result of the threat she enhanced her home security and was additionally fearful; it is untrue that there have been no reports of aggressive behavior since the issuance of the original DVCPO; incidents where D.R. tried to enter her car to get the children; and a dispute where the police were called while they were at the emergency room.

9.

**{¶ 22}** We first note that no specific testimony was presented at the hearing that the statement D.R. allegedly made was directed at S.W. S.W. testified that it was made in the context of conversation over documents and D.R.'s belief that he gave Adray the documents already, and Nunnari testified that there was a conversation going on between Adray and D.R. when S.W. put her hand to her mouth. Moreover, we defer to the trial court's factual determinations as it "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *K.H.* at ¶ 81, quoting *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). We cannot reverse a judgment based on a ""[m]ere disagreement over the credibility of witnesses or evidence. . . ." *Id.*, quoting *Sotnyk*, 2014-Ohio-3514, at ¶ 4 (6th Dist.).

**{¶ 23}** Here, the trial court found that, even if a threat was made, it could not conclude that it was directed at S.W. and it further found that, based upon the witnesses' "demeanor[s] in court, the manner in which they answered questions presented to them and the plausibility of their claims," that S.W. had "failed to prove domestic violence or a threat of domestic violence by a preponderance of the evidence." We cannot reject these findings, or substitute our own judgment, especially when there was testimony which created some question as to whether the statement was said, and if so, if it was directed at S.W.

**{¶ 24}** We find that the trial court's decision to deny S.W.'s request to renew the DVCPO is supported by some competent, credible evidence and is not against the

10.

manifest weight of the evidence.  We therefore find S.W.'s first assignment of error not well-taken.

### Conclusion

{¶ 25} The judgment of the Lucas County Common Pleas Court, Domestic Relations Division is affirmed.  Pursuant to App.R. 24, S.W. is hereby ordered to pay the costs incurred on appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.


Thomas J. Osowik, P.J.

_____
JUDGE

Christine E. Mayle, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.